**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 9/15/10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * *
                               *
UNITED STATES OF AMERICA       *
                               *  08-cr-128-01-PB
           v.                  *  December 16, 2009
                               *  11:35 a.m.
KURT SANBORN                   *
                               *
* * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Government:   Robert Kinsella, AUSA
                      U.S. Attorney's Office
                      53 Pleasant Street
                      Concord, NH 03301

For the Defendant
via video:            Alan Baum, Esq.
                      Law Offices of United Defense Group
                      4181 Sunswept Drive, Suite 100
                      Studio City, CA 91604

Court Reporter:       Sandra L. Bailey, LCR, CM, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603)225-1454

```
 1                      BEFORE THE COURT

 2           THE CLERK:  Court's in session and has for

 3   consideration a motion hearing in United States of

 4   America versus Kurt Sanborn, Criminal Case Number

 5   08-cr-128-01-PB.

 6           THE COURT:  All right, we have a video

 7   conference.  I want to be sure that counsel can hear

 8   what's being said.  Can you hear me, counsel?

 9           MR. BAUM:  Yes, your Honor, I can indeed.

10           THE COURT:  Okay, good.  All right, Mr.

11   Sanborn filed a letter with me in which he made certain

12   allegations concerning his desire to take money that he

13   had accumulated through extra work for purposes of

14   applying it to restitution but instead his lawyer had

15   him apply it, as I understood it, to pay his outstanding

16   legal fees.  Mr. Sanborn then filed some kind of motion

17   to withdraw without prejudice.  And I think these are

18   serious allegations and if he wants to pursue them, we

19   ought to find out what's really going on here, because

20   if we don't deal with it now, chances are good I'll have

21   to deal with it later on.

22           So what I propose to do is, unless someone can

23   persuade me otherwise, is take up the allegations, find

24   out what happened, determine whether it could have any

25   affect on my sentencing judgment, and resolve the matter
```

1    today.

2           Does someone want to try to persuade me that I

3    shouldn't do that?

4           MR. KINSELLA:  No, judge.  I think that you

5    have at least touched upon the fact that I was at least

6    a little bit concerned, but I do not object to the

7    proceeding going forward, that this is probably a matter

8    that is handled technically under 2255.  Judgment has

9    been entered.  It's been more than seven days past, but

10   I don't object to --

11          THE COURT:  Yeah, my view is it hinges on

12   certain facts, factual allegations, and the best time to

13   find facts is as close as possible to the time when the

14   issue arises.  I'm not saying that it would have any

15   effect on my sentencing judgment.  I need to know all of

16   the details.  But if counsel has behaved improperly and

17   in a way that prejudiced his client and it would affect

18   potentially the client's sentencing, and the client's

19   likely to raise the issue in a 2255 later on anyways,

20   let's get it out on the table and get it resolved.

21   That's my thought.

22          MR. KINSELLA:  I agree with that procedure.

23          THE COURT:  All right.  Now, Mr. Sanborn,

24   nobody else is objecting, saying we shouldn't proceed

25   now.  Mr. Sanborn, what I interpreted your letter to me

4

1    to say is, judge, at the sentencing you said that at

2    least in one other case you took into account someone's

3    willingness to work extra jobs to generate money that

4    the court couldn't force them to earn to make

5    restitution prior to sentencing and that you considered

6    that defendant's actions favorably when you sentenced

7    him.  And then you in your letter, as I'm understanding

8    it, went on to tell me, judge, I did just that.  I took

9    extra jobs and tried to earn money to accumulate money

10   to make -- towards making restitution payments, and

11   that's what I wanted to do, but my lawyer told me it

12   wouldn't do me any good and I owed the money in legal

13   fees anyways, so he just took the money that I was going

14   to make for restitution to pay the outstanding legal

15   fees.  And that's what I interpret your letter to me to

16   say.

17          Am I correctly interpreting your letter, Mr.

18   Sanborn?  I'm asking you.  You can stand right there or

19   sit, however you want.  It doesn't matter.

20          MR. SANBORN:  Your Honor, all of everything

21   that's in my letter I found out after I left the court.

22   It actually occurred through my mother and family, all

23   or most communication was through Mr. Baum and my

24   mother, so she's here to give you the entire story.

25          THE COURT:  Well, no, I guess what I'm saying,

5

1    did I correctly interpret your letter to me.  That you

2    said, judge, I took extra jobs and worked extra jobs to

3    accumulate money for the purpose of making restitution

4    payments, and I wanted to make restitution payments with

5    that money, but my lawyer convinced me to pay it to him

6    instead of to making restitution.

7              Is that -- are you alleging that?

8              MR. SANBORN:  Everything is accurate in what

9    you say, your Honor, except he didn't ask me to have

10   them transfer the money, it was sent on to him

11   specifically for restitution.

12             THE COURT:  Well, let me try to give you more

13   specifics.  Did you take extra jobs to earn money to

14   apply towards your restitution, anticipated restitution

15   obligation?

16             MR. SANBORN:  Yes, sir.

17             THE COURT:  What jobs did you take?

18             MR. SANBORN:  I worked -- I have a full-time

19   job in sales, so I travel a lot, so I was very kind of

20   makeshift, but I was able to work on weekends and on

21   Sundays to help put in irrigation systems and things

22   like that for my brother's landscaping company which he

23   then gave the money to my mother to save for me in

24   anticipation of trying to do whatever I could

25   financially to help pay restitution.

6

1          THE COURT:  All right, so in addition to your

2    sales job you worked for your brother installing --

3          MR. SANBORN:  Irrigation systems.

4          THE COURT:  Irrigation systems.  And your

5    brother paid the money that he owed to you to your

6    mother rather than to you.

7          MR. SANBORN:  I don't have a great track

8    record of saving money, so it was going right to my

9    mother so that I would have some form of restitution

10   based upon Mr. Baum encouraging me to do so.

11         THE COURT:  All right, so Mr. Baum had in fact

12   told you it would be a good thing if you could

13   accumulate some money to apply to restitution.

14         MR. SANBORN:  And I tried not only by working,

15   but family and friends also helped participate because

16   he said the bigger number I could give, the more impact

17   it would have on this court.  And we even got to the

18   point where we considered selling my mother's house and

19   things like that to try to do as much as we could to pay

20   that number down.

21         THE COURT:  All right.  How much money did you

22   accumulate in your mother's possession through your own

23   labor, working doing installing irrigation systems?

24         MR. SANBORN:  Only about $5,000.

25         THE COURT:  So about $5,000 was accumulated

1  through your labor?

2          MR. SANBORN:  Correct.

3          THE COURT:  Did you get any additional money

4  from third parties that was in this pool of money?

5          MR. SANBORN:  Yes, sir.

6          THE COURT:  And how much was that?

7          MR. SANBORN:  About $15,000.

8          THE COURT:  All right.  So, you earned 5,000

9  and your family and friends contributed an extra 15,000,

10  and all of this was being maintained by your mother, a

11  total of about $20,000?

12          MR. SANBORN:  Yes, sir.

13          THE COURT:  And this was separate and apart

14  from any fee arrangement you had with your counsel?

15          MR. SANBORN:  We were specifically saving it

16  and acquiring it to get it to him prior to trial so that

17  he would be able to present it to you here in this court

18  that day.

19          THE COURT:  All right.  And you say in fact

20  something else happened to the money?

21          MR. SANBORN:  I would be telling you from what

22  I'm being told by my mother and family what happened.

23  If the court allows, she would be happy to come up and

24  tell you exactly what occurred.

25          THE COURT:  Well, I'm trying to -- I'm trying

8

1    to understand what you know.  So did you know prior to

2    sentencing that you had accumulated through your labor

3    and contributions from family approximately $20,000?

4                MR. SANBORN:  I knew that my mother had

5    forwarded at Mr. Baum's request to Kathleen in the

6    office $20,000 of payments that were designated for

7    restitution.

8                THE COURT:  All right.  And did you have any

9    discussions with Mr. Baum prior to sentencing about the

10   plan to offer that as restitution?

11               MR. SANBORN:  He said to me that the figure,

12   he said to all of us, my entire family, that the amount

13   of money that we had acquired would be an insult to

14   present to the court.

15               THE COURT:  So you did have the discussion

16   with him in the presence of other people?

17               MR. SANBORN:  Yes.  He told us that it would

18   be detrimental to me for you to be presented 20,000

19   because based on the time it took to finally get to

20   sentencing, I should have acquired a lot more money than

21   that.

22               THE COURT:  All right.  And so what did -- did

23   he then say what should happen to the money?

24               MR. SANBORN:  At that point he went over and

25   started discussing things with my mother.

9

1        THE COURT:  And when did this conversation

2    take place?

3        MR. SANBORN:  About two minutes before we came

4    into the court.

5        THE COURT:  So the first you had heard about

6    the 20,000 not being offered as restitution was the day

7    of the sentencing?

8        MR. SANBORN:  When we left chambers here, Mr.

9    Baum left, and my family said that they were prepared to

10   jump out of their seat to say why don't you tell the

11   judge that you did work, we did raise money and, you

12   know, maybe $20,000 isn't a lot to, you know, people,

13   but it is to us.  And they said that -- my mother at

14   that point told me that he had her write a handwritten

15   note to transfer the money from the trust account at his

16   law firm to their business account for payment.

17       THE COURT:  What was your fee arrangement with

18   Attorney Baum?

19       MR. SANBORN:  When I first hired him, he told

20   me it would be 150,000 to go to trial and 50,000 to

21   plea, and my family can't afford 150,000, so.

22       THE COURT:  And did you give him the $50,000?

23       MR. SANBORN:  We gave him 30.

24       THE COURT:  You gave him 30.

25       MR. SANBORN:  We still owed him 20.

1           THE COURT:  And you owed him 20.  And what

2    arrangements, if any, did you make with him concerning

3    the $20,000?

4           MR. SANBORN:  There was never -- I mean, we

5    would just pay him, but there was never any arrangement,

6    just there was a signed agreement at the outset over a

7    year ago that had a $50,000 fee in it, so we still owed

8    $20,000.

9           THE COURT:  And is it just a coincidence that

10   the amount you owed him was the same amount that you and

11   your family had accumulated for restitution?

12          MR. SANBORN:  I should say I don't really know

13   how much we owe him because we paid sporadically when we

14   had money to his bill.  He took the 20, so I'm assuming

15   it was 20.  I don't really know, your Honor, how much is

16   really owed.

17          THE COURT:  All right.

18          MR. SANBORN:  I know that we had paid --

19   through the course of the last year the communication

20   with Mr. Baum's firm was not truly with Mr. Baum, it was

21   typically with another gentleman that was calling my

22   mother and I for money, for payment, and we would do

23   what we could do.

24          THE COURT:  All right.  Mr. Baum, your client

25   has in his letter to me and today made certain

1    allegations that raise questions about your relationship

2    with him.  Obviously to the extent that it's necessary

3    to respond to those allegations, the attorney/client

4    privilege is waived, and I would ask you, what is your

5    response to these allegations?

6              MR. BAUM:  Um, to put the issue in context,

7    your Honor, I guess I'll go back.

8              Mr. Sanborn retained my firm.  I'm an employee

9    of United Defense Group.  It's not my firm.  I'm a

10   salaried employee.  But nonetheless I have reviewed the

11   history financially with my business office and then I

12   can talk about my personal contact with Mr. Sanborn and

13   the restitution issue.  But Mr. Sanborn retained United

14   Defense Group in March of '08.  At that time he knew he

15   was under investigation but he had not been charged.

16   From March of '08 the -- my relationship with the

17   government resulted in a plea agreement being entered

18   into.  A guilty plea was entered before your Honor or

19   the magistrate, I don't recall which, and then

20   eventually sentencing.

21             Your Honor inquired about fees.  My office

22   records indicate that the agreed fee was $40,000, and of

23   that Mr. Sanborn or his mother primarily have paid a

24   total of $22,500.  The payments came in mostly in '08,

25   and in '09 a thousand dollars total has been paid

1    towards that fee.

2            That was not my motivation or my thinking at

3    all when the matter of restitution was considered.  Mr.

4    Kinsella has a number of exhibits that the government

5    may be offering in this hearing, but they are

6    essentially e-mails going back to March of '09 between

7    myself and Mr. Sanborn, and in one or two instances

8    between myself and Mr. Kinsella, and these e-mails show

9    a long history of my encouraging Mr. Sanborn to come up

10   with restitution because I felt that would be very

11   helpful in the 3553(a) factors concerning his efforts to

12   make restitution.

13           The first that is relevant to restitution in

14   this long chain of e-mails was dated March 19th of '09,

15   at which time I wrote to Mr. Sanborn, "I have already

16   filed a motion to postpone the sentence until June and

17   I'm waiting for the judge's decision which should be

18   okay.  I'll let you know.  Payment of a substantial

19   amount towards restitution would be very helpful as

20   would paying the balance of attorney's fees.  Also,

21   still waiting to get ready for an evaluation."

22           Your Honor may recall in the sentencing

23   memorandum that was filed with the court, there was a

24   psychological evaluation from a Dr. Drogin.

25           In my conversations with Mr. Sanborn from the

1    very beginning I emphasized how important restitution

2    would be.  Once I was satisfied that I had done my due

3    diligence in so far as the government having enough

4    evidence to convict him, and once Mr. Sanborn admitted

5    to me that he had committed the acts that were alleged,

6    a plea agreement seemed to be the most appropriate way

7    to resolve the case rather than a trial.  And I've been

8    practicing criminal law for over 40 years.  I practice

9    mostly in federal court and I'm very much aware of the

10   application of the guidelines and the 3553(a) factors,

11   and I pride myself on being able to test the -- to

12   anticipate what will be important at sentencing and

13   address those issues.

14          So, I was certainly mindful of how restitution

15   could have an impact on the court's attitude towards

16   Mr. Sanborn and his integrity and his acceptance of

17   responsibility and so forth.

18          Starting before these e-mails I had discussed

19   with Mr. Sanborn the strategy, if you will, for

20   sentencing, and that I had to be assured by him that he

21   realized how important restitution was and he would be

22   making those efforts.

23          The string of e-mails that I believe your

24   Honor is reviewing now reflect my regular reminding of

25   Mr. Sanborn of my -- and my encouraging him to address

1    this restitution issue.

2            I was aware that he had a job at Geocomp.  A

3    letter from his senior vice president was part of the

4    package that was submitted to your Honor in the

5    sentencing memorandum.  And I was aware he was doing

6    well at that job, but the issues of restitution always

7    seemed to be that his family was going to come up with

8    it, his mother was going to come up with it, some of

9    these e-mails refer to a cousin or one of the e-mails

10   refers to a cousin.  Mr. Sanborn felt that his cousin

11   was going to come up with 100 to $150,000 towards

12   restitution.

13           I keep pretty detailed notes of conversations

14   that I have with people, telephone conversations, and

15   I'm reviewing my notes here.  I find that in June of '09

16   at Mr. Sanborn's suggestion I spoke to his mother Judy,

17   Judith, about restitution.  Mr. Sanborn told me that his

18   mother was willing to help in the payment of

19   restitution.

20           When I spoke with her on June 1st, we spoke

21   about that subject.  She told me that the only way that

22   she could raise any kind of money would be selling her

23   house which was the only security she had for her later

24   years and that she was very reluctant to do that.  I

25   told Kurt that I had spoken with his mother and that

15

1   that was her feeling about restitution.

2          It was a constant issue between Mr. Sanborn

3   and me, and it wasn't a bone of contention.  It was me

4   trying to counsel him and advise him on ways that he

5   could improve his position before the court for

6   sentencing.

7          Your Honor will recall or the record will

8   reflect there were a number of postponements for

9   sentencing, and there were two main reasons.  Mr.

10  Kinsella and I had discussed each time sentencing was

11  coming up that I needed more time and we filed assented

12  to motions to continue sentencing repeatedly, and that

13  was in order to give Mr. Sanborn an opportunity to come

14  up with restitution, and there was also a problem with

15  paying Dr. Drogin who wouldn't go ahead and do the

16  evaluation, which I thought might be helpful, until he

17  got paid.

18          So there were a series of postponements, two,

19  three months at a time for those reasons and those

20  reasons alone.  It had nothing to do with my convenience

21  or my schedule, it was strictly to improve Mr. Sanborn's

22  position before the court when it came time for

23  sentencing.

24          Concerning the scenario leading up to the

25  $20,000 issue, there are e-mails in these exhibits that

16

1   reflect our encouraging and our guiding Mr. Sanborn on

2   how to get that money to us, including wiring

3   information, and his repeated assurances that it's on

4   its way, it's on its way.  What finally happened was a

5   day or two before I left for court, left California to

6   come to Concord, I received the e-mail -- or the fax

7   which is Exhibit 23, and as your Honor can see it says

8   "Enclosed are three checks totaling $20,000 for Kurt D.

9   Sanborn."  It did not indicate that they were for

10  restitution.  The balance for fees were about $20,000.

11  And I, you know, in all candor I don't doubt that they

12  intended that this be for restitution.  It was a little

13  ambiguous, but nonetheless the checks came in.  The

14  problem was that, and I'm a little uncomfortable saying

15  this, I don't want it to sound critical, but the issue

16  has been raised and I feel that it's important to

17  explain.  The history of promises unfulfilled by Mr.

18  Sanborn led me to be somewhat skeptical about this money

19  for a number of reasons.  Of the three checks, which I

20  believe are attached as Exhibit 23a, only one was from

21  anyone that I knew, and that was his mother for $5,000,

22  and she was the one who had been making the attorney's

23  fees payments all along anyway.  I don't think Kurt

24  Sanborn ever sent us any money.  It always came from his

25  mother, including the initial retainer and payments

1    throughout 2008.  In fact, in July there was a payment

2    of $10,000, a check from Judith Sanborn, which bounced,

3    and then was replaced by another check.

4            So when I got these -- this fax, I didn't know

5    who these other people were or what had been represented

6    to them as to why they were sending us money.  I was a

7    little skeptical frankly because Mr. Sanborn has, in my

8    opinion, a tendency to exaggerate or perhaps his

9    credibility is -- I was just skeptical.  I didn't know

10   what had been represented as to why this money was being

11   sent to us from Linda Coburn --

12           (Evacuation drill in Mr. Baum's building.)

13           THE COURT:  We will just take a short break.

14   Please stay available.  These usually take about ten

15   minutes and we will -- is this our building?  Oh, this

16   is his building.  We will take a break until you come

17   back, sir.

18           MR. SANBORN:  Thank you, your Honor.

19           THE COURT:  All right, so we will -- call me

20   when he's back.

21           (Recess taken.)

22           THE COURT:  All right, Attorney Baum, why

23   don't you finish what you were saying.

24           MR. BAUM:  Thank you, your Honor.  I was

25   explaining my thinking so far as why I failed to inform

1   the court about these three checks, and a lot of it had

2   to do with the history of Mr. Sanborn and his somewhat

3   manipulative attitude towards things, including the fact

4   of trying to get his -- I'm sorry?

5          THE COURT:  To summarize here, I understand

6   you're telling me that you had a long history with Mr.

7   Sanborn in which you had not gotten your bill fully

8   paid, that Mr. Sanborn's mother at one point bounced a

9   check to you, and you had had many conversations with

10  Mr. Sanborn about the importance of trying to provide

11  restitution, and him having made statements to you

12  suggesting that some restitution payments would be

13  forthcoming but nothing materialized, you received these

14  checks very close to the time of the scheduled

15  sentencing, only one of them was from a person that was

16  known to you, you didn't know anything about the other

17  two, you weren't sure that the checks would clear, and

18  you therefore didn't think it would be a good idea to

19  talk about them at the sentencing.

20          Is that a fair summary of what it is you're

21  telling me?

22          MR. BAUM:  That's an excellent summary, your

23  Honor.  My concern was had I represented to the court

24  that we now had $20,000 towards restitution.  Had the

25  court inquired as to the source of the restitution, I

1    would have had no answers.  Furthermore, at the time

2    that we appeared before your Honor for sentencing I

3    didn't know whether those checks would clear, and I

4    felt, as I explained to Mr. Sanborn in Exhibit 21, the

5    e-mail that I sent him after I became aware that he and

6    his family were dissatisfied with my not having brought

7    up the restitution, especially when your Honor had

8    inquired about restitution and that commented how that

9    can sometimes help, my explanation was that I chose not

10   to mention it because I thought that it might be

11   counterproductive.

12            THE COURT:  Did you have any -- excuse me,

13   prior to the time of the sentencing, did you have any

14   conversations with either Mr. Sanborn or his mother

15   about these checks?

16            MR. BAUM:  Yes.  In the hallway outside court

17   shortly before the sentencing hearing I contacted my

18   office and I learned that the checks had been received

19   by my office the previous day --

20            THE COURT:  Stop, stop, stop.  I'm confused

21   now.  Are you telling me that the first you learned of

22   these checks having been received by your office was

23   when you were here in New Hampshire immediately before

24   the sentencing?

25            MR. BAUM:  Yes, your Honor.  The fax that I

1  received a couple of days earlier have photocopies of

2  the checks, which is one of the exhibits before your

3  Honor, but they had not reached my office by the time I

4  left for Concord the day before sentencing.

5         THE COURT:  Oh, okay.

6         MR. BAUM:  The fax with the photocopy had

7  reached us, but the checks themselves had not.  I called

8  my office early that morning of sentencing and I found

9  out that the checks had arrived in the mail late the day

10  before, but they hadn't been processed.  So that was

11  further concern that I had in making a representation to

12  your Honor that we actually had restitution, I couldn't

13  make that representation in good faith.

14         THE COURT:  Between the time that you received

15  the fax and the day of sentencing, did you have any

16  conversations with either the defendant or his mother

17  about these checks?

18         MR. BAUM:  No, sir.

19         THE COURT:  And then on the day of sentencing

20  after you called your office and learned that the checks

21  had been received, did you have any conversations with

22  the defendant or his mother between the time you learned

23  that the checks had been received by your office and the

24  time of the sentencing hearing?

25         MR. BAUM:  Yes, your Honor, we were all out in

1    the hallway, Mr. Sanborn, his mother and several

2    relatives.  I'm not sure that the relatives overheard

3    the conversation, but I explained that I confirmed that

4    the office had received the checks but that they hadn't

5    cleared and I thought it was a bad idea to make a

6    representation to the court that we had this money for

7    restitution.  At that time I did talk to the mother

8    privately about her continuing obligation and promise to

9    pay the fees, and she agreed to apply the $20,000

10   towards the balance of fees.  I'm telling you, your

11   Honor --

12            THE COURT:  Let me in understand the --

13            MR. BAUM:  -- in all candor --

14            THE COURT:  Let me understand the relationship

15   between those two conversations.  You're describing a

16   conversation in which Mr. Sanborn was a participant in

17   which you explained to Mr. Sanborn and his mother that

18   it would be inadvisable to raise the $20,000 with the

19   court, and then you were describing another conversation

20   with the mother that what you say was private in which

21   you reminded her of Mr. Sanborn's continuing debt to the

22   firm.

23            Tell me about the temporal relationship

24   between these two conversations.  When did they occur in

25   relation to each other?

1          MR. BAUM:  Oh, just all within the same couple

2     of minutes before we came into the courtroom.

3          THE COURT:  Did you pull the mother away or

4     did you ask Mr. Sanborn to leave?  How did it happen

5     that you spoke to her privately about the fee?

6          MR. BAUM:  When I say I spoke to her

7     privately, I didn't mean to imply that I made any effort

8     to prevent Mr. Sanborn from listening to what was

9     discussed.  I was just addressing my comments to Mrs.

10    Sanborn, and I think that Mr. Sanborn was there at the

11    time, and then she handwrote in front of everybody this

12    authorization to apply this $20,000, if it cleared,

13    towards fees.

14         THE COURT:  Did you suggest to her that the

15    money should be applied to the fee?

16         MR. BAUM:  Yeah.  Yes.

17         THE COURT:  Okay.

18         MR. BAUM:  The only other thing I have to

19    comment on, your Honor, is the matter of three jobs that

20    Mr. Sanborn represented in his motion.  I never heard

21    anything about him working weekends or extra jobs or

22    money being accumulated.  All of the representations he

23    made to me about restitution had to do with members of

24    his family coming up with the money.  Never said

25    anything about any other jobs.  I clearly, had I known

1    about that, would have informed the court.  If you

2    recall my sentencing memorandum, I tried to present all

3    of the mitigating factors, and that certainly would have

4    been something that I would have brought to the court's

5    attention.  The first I heard of any jobs other than the

6    one, the Geocomp, was when I saw the motion for

7    reconsideration that Mr. Sanborn's mother brought.

8              THE COURT:  Is it your position that the

9    advice you gave Mr. Sanborn and his mother concerning

10   the issue of whether to mention the money at sentencing

11   was independent advice that was unrelated to the later

12   communication you had with Mr. Sanborn's mother about

13   applying that balance to the outstanding fee balance

14   with the firm?

15             MR. BAUM:  That is my testimony, your Honor.

16   Absolutely unequivocally my principal concern was not

17   getting the firm paid.  My concern was making the best

18   presentation to the court concerning Mr. Sanborn and the

19   sentencing factors.

20             THE COURT:  All right.  Now, if you had known

21   that the $5,000 was earned by Mr. Sanborn through

22   working additional jobs for the purpose of generating

23   monies to apply to restitution, would that have affected

24   your thinking about whether that was something that

25   should be mentioned to the court, assuming that you

1   could independently verify it?

2          MR. BAUM:  Probably, your Honor, I probably

3   would have postured it to the court in a way that would

4   be candid with the court that although the money was in

5   check from Mrs. Sanborn, if I were satisfied that that

6   $5,000 was money that Mr. Sanborn had earned and had in

7   fact given it to his mother for her to send me for

8   restitution, then that would have been legitimate.  That

9   would have been a legitimate mitigating circumstance

10  which I would have asked the court to consider.

11         THE COURT:  Even though it was small in

12  relation to the total restitution obligation and

13  arguably is viewed in a different light if it can be

14  demonstrated that in fact the person took on extra work

15  assignments and devoted income generated from that to

16  restitution.  In terms of what it says about somebody's

17  acceptance of responsibility, efforts to make amends for

18  his crime and to say what it says about somebody's

19  potential for rehabilitation, it seems arguably that

20  that kind of action needs to be viewed differently from

21  simply someone who is able to prevail upon friends with

22  means to pay off his restitution obligation in advance.

23  In terms of what it says to a judge, it seems to me

24  those two are very different kinds of things.  Do you

25  agree with that or not?

1          MR. BAUM:  I agree with that wholeheartedly,

2    your Honor.  There have been many cases where I have

3    presented evidence to a court where there has been

4    substantial restitution and my client has had meager

5    earnings but has made some effort just along the lines

6    of not the dollar amount but the sincerity of the

7    acceptance of responsibility.  So I most definitely

8    would have brought that to the court's attention and the

9    dollar amount would not have prevented me from doing

10   that.

11         THE COURT:  And did anyone tell you at any

12   point prior to the sentencing that the $5,000 that came

13   from the defendant's mother was in fact money that the

14   defendant had himself earned by working additional jobs?

15         MR. BAUM:  No, your Honor, that was never

16   mentioned at all.

17         THE COURT:  The first you heard of that was

18   after the sentencing?

19         MR. BAUM:  When I read it in the motion, yes.

20         THE COURT:  Okay.  And I take it you've had

21   the money removed from the trust account and applied to

22   the outstanding fee balance owed to the firm?

23         MR. BAUM:  Oh no, not at all, your Honor.

24   Once I was aware of this controversy, I instructed my

25   office not to touch the money and it's still in the

26

1   trust account, and we will defer to the court if the

2   court --

3           THE COURT:  Do you have a --

4           MR. BAUM:  -- makes some ruling.

5           THE COURT:  Do you have a fee agreement with

6   the defendant in this case?  Is there a written fee

7   agreement?

8           MR. BAUM:  Yes, your Honor.

9           THE COURT:  And who is obligated under the fee

10   agreement.  Is it the defendant or is it the defendant's

11   mother or who's obligated under it?

12           MR. BAUM:  If I may review the retainer

13   agreement, your Honor.  It was signed by Kurt Sanborn,

14   although all of the commitments and payments were made

15   by his mother.  On June 1st of 2008 Kurt Sanborn signed

16   the retainer agreement.

17           THE COURT:  All right.  Did you, when you

18   suggested to the defendant's mother that they apply this

19   money to the outstanding balance of the firm, did you

20   inform her as to what consequences would follow, if any,

21   if she didn't do that?

22           MR. BAUM:  No, your Honor.

23           THE COURT:  Specifically did you tell her I'm

24   not going into court today and I won't represent your

25   son on this matter unless it's paid or something like

1    that?

2              MR. BAUM:  Oh heavens, no.  Absolutely not.

3    Neither in words nor in inference.

4              THE COURT:  All right.  Is there anything else

5    you wanted to tell me?

6              MR. BAUM:  I always had a very -- no, your

7    Honor.

8              THE COURT:  Okay.  Is there anything else you

9    wanted to tell me about -- anything about this matter

10   that you feel I need to know?

11             MR. BAUM:  I can see how Mrs. Sanborn might

12   have felt -- might have felt pressured.  She's a very

13   good woman and she's tried to keep her son's commitment

14   to my firm and help him by making payments when she

15   could, and I apologize if I caused her any more stress

16   than this whole experience has caused her.  I have much

17   greater compassion for her than I do for her son who I

18   think has been very manipulative to his family and has

19   contributed or exacerbated their whole experience.

20             THE COURT:  All right.  Mr. Kinsella, what if

21   anything did you want to say in addition to what's

22   already been said?

23             MR. KINSELLA:  I think that, and I don't know

24   if it makes a difference to you, but I think I should

25   point it out that you have been discussing with Mr.

1   Sanborn --

2           MR. BAUM:  Your Honor, I'm sorry, I can't hear

3   Mr. Kinsella.

4           MR. KINSELLA:  I'm sorry.

5           THE COURT:  Can you hear him now?

6           MR. KINSELLA:  Is that better?

7           MR. BAUM:  Yes, thank you, your Honor.  Yes, I

8   can hear you now.

9           MR. KINSELLA:  You've had some discussion with

10  Mr. Sanborn and Mr. Baum relating to the $5,000 that

11  came from the defendant's mother that we've been talking

12  about was earmarked by the defendant allegedly for

13  restitution.  However, in his motion to reconsider, the

14  defendant's mother, in the motion that she signed for

15  the defendant states, "the defendant had worked in some

16  cases up to three jobs to be able to accumulate $20,000

17  in restitution payments".  So there's sort of a

18  disconnect between what was represented to the court in

19  the beginning, what's now being talked about in the

20  court based upon what has been represented to the court

21  today.  I think that Mr. Baum had just mentioned that he

22  was unaware of the $5,000 that the mother had

23  contributed, that that would be for restitution, and he

24  wasn't aware of that fact until he reviewed the motion,

25  but the motion says it was $20,000 that was earned

1   through these jobs.

2          THE COURT:  All right, Mr. Kinsella, will you

3   remind me, what was the amount of restitution that was

4   owed here in total?

5          MR. KINSELLA:  Slightly more than $290,000.

6          THE COURT:  Okay.  Mr. Sanborn, did you want

7   to say anything else in response to what you just heard?

8          MR. SANBORN:  If I may, your Honor.

9          THE COURT:  Yes.

10          MR. SANBORN:  In Mr. Baum's testimony he

11   states that he was unaware that these funds would

12   specifically be designated for restitution.  But if you

13   look at the e-mail of November 10 that was sent by his

14   accounting people, it specifically states that the

15   account is to be made out to the trust account, whereas

16   the payments that had been made to his office --

17          THE COURT:  Which exhibit number are we

18   talking about?

19          MR. SANBORN:  It should be Exhibit 16, your

20   Honor.  Under account number it says you make it out to

21   the trust account, whereas any previous payment made has

22   always been made out directly to his firm.  And if you

23   reference the checks that were sent, you will see that

24   they're made out to the Defense Group Trust Account.

25          I'll also make it absolutely 100 percent clear

1      that there was very little communication between Mr.

2      Baum and myself except that it was constantly a request

3      not necessarily from Mr. Baum, but from another person

4      in his office for payment.

5                    We also had to pay $5,000 which, as you can

6      see, we're not financially wealthy people, so $5,000 is

7      a lot of money, and we had to pay for the Dr. Drogin

8      report before that would proceed.  So that was money

9      also that was earned.

10                   I also want to point out that based upon what

11     I've heard today from Mr. Baum it makes it very clear to

12     me that I don't know how he could ever properly defend

13     me based upon what he's saying.

14                   I would also like, your Honor, Mr. Baum has

15     brought my mother into this and made it clear that a big

16     part of the conversations that he's had and conducted

17     over the last year had been with her.  She's here today

18     and I would respectfully ask the court to allow her to

19     talk and tell you, because there's a lot of pieces I

20     wasn't associated with --

21                   THE COURT:  I'm happy to hear what she has to

22     say, but to be clear, Mr. Baum didn't bring your mother

23     into this, you brought your mother into it by involving

24     her in this effort to -- I mean, you're an adult.

25     You're not a child.  If you wanted to retain counsel and

1    pay counsel and interact with counsel, you are free to

2    do that.  You've chosen apparently to involve your

3    mother.  You also chose to write me a letter that

4    inevitably would implicate and involve your mother in

5    this matter.  So it's you who did it, not anyone else.

6    But I'm happy to hear, if your mother wants to say

7    something, I'm happy to hear what she wants to say.

8              MR. SANBORN:  I agree, sir, and I've taken

9    full responsibility for it.  The only reason she is

10   involved is, as you can tell, I have not been

11   financially very good with money.  So the monies that

12   were paid to Mr. Baum's firm and the monies that I said

13   were all earned from me, I gave her money to pay my

14   bills because I'm not very good at it, sir, I'm just not

15   good at it.

16             THE COURT:  If you want her to say something,

17   I'm happy to hear what she has to say.  I haven't taken

18   any sworn testimony here.  I'm not doing this with

19   prejudice to the defendant's right to pursue relief

20   under Section 2255 which would need to be through an

21   appropriate motion, I'm pursuing this matter because

22   when I get a letter from a defendant that makes

23   allegations about his attorney that call into question

24   whether his attorney is behaving in accordance with the

25   requirements that we impose upon attorneys who appear in

1    front of us, I feel duty bound to make some inquiry to

2    determine whether there's a basis to refer the attorney

3    for some kind of review either by this court or by the

4    bars of which he's a member, and that's the purpose for

5    which I'm conducting this inquiry now, and I'm doing it

6    in an informal way in an attempt to see whether there's

7    a need to do something more formal.  But, so I'm not

8    going to ask that your mother be sworn, but if she wants

9    to say something, I'll be happy to hear what she wants

10    to say.

11         MR. SANBORN:  I would welcome that.  Thank

12    you, your Honor.  One other just quick thing before she

13    comes up.

14         THE COURT:  Yup.

15         MR. SANBORN:  When we were in that hallway

16    prior to sentencing, obviously a very difficult time, it

17    was made clear to us that the money, and we did confirm

18    the next morning on the 20 because we couldn't do it by

19    the time we left court, that that money had cleared and

20    was in their account, there's no question about that,

21    the issue that we have very simply in that motion and

22    maybe we didn't articulate it because we're not

23    attorneys was just this.  Knowing what you were saying

24    in court that day, your Honor, that it was so important

25    to have earned money, I did, but Mr. Baum elected not

1   even to discuss it, to even bring it up in any way, but

2   yet one minute before we walked into this courtroom he

3   pulled my mother aside and had her, if he didn't think

4   this was restitution money, why did he have her

5   handwrite a letter that stated he could take the money

6   out of the trust and put it into the operational

7   account.  And our concern is just why didn't he put the

8   best foot forward, and based upon his testimony today,

9   it's apparent to me that he just didn't have that

10  intention.

11          THE COURT:  All right, I'll hear whatever --

12  ma'am, if you want to say something, come on up here so

13  you can speak into a microphone.  And you can, if you're

14  comfortable standing there at the lectern, you can do

15  that.

16          MRS. SANBORN:  Your Honor, I'm not comfortable

17  here at all.  I think I've only spoken with Mr. Baum

18  twice other than out here in the hall.  That day we were

19  all distressed, I admit.  We were listening to him tell

20  the proceeding.  The very last thing he said was about

21  not presenting you with money because it would be an

22  embarrassment.  As soon as the people started coming out

23  of the door prior to our case, he went to his briefcase,

24  took out a pad like this and asked me to authorize them

25  to take that $20,000 out.  Now, I have never received a

34

1    statement from them, a financial statement at all,

2    never, and I did check and -- but I have had many

3    harassing phone calls from David Rosen in his office

4    asking me for money, and I finally told him that any

5    more money, we had no more money, it would have to be

6    earned first and then given to him, and his statement to

7    me was sell your house, just outright like that.  So I

8    feel that I'm just as -- that I was right in sending

9    money.  Any money I had sent is because he has earned

10   it.  He gives it to me.  Any money that people have

11   given us for this restitution --

12            THE COURT:  Well, let me try to be sure I

13   understand this.  There are three checks here.

14            MRS. SANBORN:  Yes.

15            THE COURT:  One is for $5,000 made out --

16   drawn on your account.

17            MRS. SANBORN:  That's right.

18            THE COURT:  And the other two are drawn on

19   other accounts.

20            MRS. SANBORN:  That's right.  That was money

21   that was given to me which he has already started paying

22   back to these people for this.

23            THE COURT:  All right, so he hadn't worked any

24   jobs to earn the --

25            MRS. SANBORN:  Oh, he did.  There was other

1    money.  But don't forget, we had to give it to Dr.

2    Drogin.

3              THE COURT:  Can I just finish, ma'am.

4              MRS. SANBORN:  Go ahead.

5              THE COURT:  The $5,000 check on the Coburns,

6    he didn't do any work for that money, that was a

7    contribution from a friend.

8              MRS. SANBORN:  No, no, it's a loan.

9              THE COURT:  Okay.  And the same from Dr.

10   Tripathi, that's just a loan that he made, not something

11   that your son worked for.

12             MRS. SANBORN:  Well, he is working for it.

13             THE COURT:  I understand that, but I --

14             MRS. SANBORN:  That's right.  Not extra jobs,

15   yes, you're right.

16             THE COURT:  I just need to have my questions

17   answered.

18             MRS. SANBORN:  Yes.

19             THE COURT:  Do you have any personal knowledge

20   as to whether the $5,000 that was drawn on your account,

21   whether that was money that was in fact earnings that

22   your son acquired and was paid to you rather than him by

23   working for his brother?

24             MRS. SANBORN:  My other son --

25             THE COURT:  And just be sure, it's important

1   to be truthful with me.

2          MRS. SANBORN:  Yes.  He had given me some

3   money but that 5,000 is money Kurt gave to me in bits

4   and pieces because that's the only way he can do it.  He

5   can't take a legitimate, a weekly part-time job in

6   excess, he travels too much.  So that was his money.

7          THE COURT:  Let me be clear.  You're telling

8   me that the $5,000 that is the amount of this check that

9   you wrote to the Defense Group trust account, is money

10  that your son, the defendant, gave to you, not your --

11  not the defendant's brother, but the defendant gave it

12  to you?

13         MRS. SANBORN:  Yeah, but some of that, one son

14  gave it to the other and he just gave it to me because

15  I'm the keeper of it.

16         THE COURT:  Just so we have no

17  misunderstanding.  You're telling me the defendant, Kurt

18  Sanborn, gave you this money, not his brother?

19         MRS. SANBORN:  Right.

20         THE COURT:  Okay.  And what you're saying is

21  your understanding is, that some of that money Kurt

22  Sanborn got from his brother in exchange for doing work

23  for his brother.

24         MRS. SANBORN:  Right.

25         THE COURT:  Okay.  And are you telling me also

1   that that $5,000 was money that Kurt Sanborn had

2   acquired and given to you for the purpose of using it

3   for restitution?

4           MRS. SANBORN:  Ah-hum, ah-hum.

5           THE COURT:  You're nodding your head yes.

6           MRS. SANBORN:  Yes.

7           THE COURT:  Is there anything else you want me

8   to know?

9           MRS. SANBORN:  If I could think about it, but.

10          MR. KINSELLA:  Judge, may I ask a question?

11          THE COURT:  Yes.

12          MR. KINSELLA:  The two additional checks, one

13  from a doctor for I believe 5,000 or 10,000.

14          MRS. SANBORN:  10,000.

15          MR. KINSELLA:  And another from the Coburns --

16          MRS. SANBORN:  Another five.

17          MR. KINSELLA:  Did you participate in

18  conversations with them through which they agreed to

19  give money to the defendant?

20          MRS. SANBORN:  Yes, they know what it was for.

21          MR. KINSELLA:  Did they know it was for -- did

22  they think it was for restitution?

23          MRS. SANBORN:  Oh yes.

24          MR. KINSELLA:  Or to pay a legal fee?

25          MRS. SANBORN:  No.  It was for restitution.

1    That's why they both said for the trust account, because

2    it wasn't to pay the legal fees.

3              THE COURT:  Okay.  Well, thank you, ma'am.

4    You're all set?  All right.

5              As I said, I'm not going to treat this as a

6    2255 motion.  I think the defendant should be free to

7    decide for himself whether he has any Section 2255 claim

8    here or not, but his letter was something I simply

9    couldn't overlook.

10             I have not taken sworn testimony here today.

11   I've asked each party to give me their information

12   concerning it.

13             A couple of things.  I don't know if it will

14   be any consolation to you, Mr. Sanborn, but I can't say

15   that the restitution payments that you were proposing to

16   make here would have affected my sentencing judgment in

17   any way.  I really believe that that is quite unlikely

18   that it would have affected my judgment in any way.  I

19   feel very strongly that the $15,000 that you were able

20   to get friends to pay really would not have affected my

21   judgment in any way.

22             It might have been, if in fact you could have

23   demonstrated that you in fact had worked on these other

24   jobs, affidavits from people who you had done the jobs

25   for, something from your mother saying you had

1    accumulated this restitution account and had that all

2    lined up in advance of sentencing, that would have been

3    a mitigating factor in my mind because I can't make you

4    work to pay restitution.  I can only require you to try

5    to get a job and to pay a small percentage of your money

6    towards restitution.  And so although $5,000 is very

7    small, it could have potentially been another mitigating

8    factor to add to the mix in terms of sentencing.  But

9    even so, I doubt frankly that it would have affected my

10   sentencing judgment in any way.  And if it did affect my

11   sentencing judgment, it would only have been a very

12   minor affect because I had to consider many other

13   factors in sentencing you.

14            In terms of what happened here, my principal

15   concern is whether I need to take any action against

16   Attorney Baum.  And I'm not prepared, based on what I've

17   heard today, to conclude that a referral to a

18   professional conduct committee is warranted.  If you

19   have a different view of it, Mr. Kinsella, I'd be

20   interested in hearing your assessment of the matter.

21            MR. KINSELLA:  I do not, judge.

22            THE COURT:  All right, Mr. Sanborn, you're

23   free to make any complaints that you wish to make.  I

24   would suggest this, however, though.  Having heard the

25   story, Attorney Baum, I am concerned about the --

1    whether Judith Sanborn in fact even has the authority to

2    assign checks written by others for a different purpose

3    to be applied to your outstanding fee.  Those

4    individuals have no, as far as I can see, have no legal

5    obligation to the defendant or to your firm, and if they

6    wrote checks that were intended for restitution, I don't

7    believe that it's clear to me on this record that Mrs.

8    Sanborn has any power to assign them to your firm for

9    purposes of payment of your fee.  Now that you've heard

10   her testimony on that point or her explanation, unsworn

11   statement, if it's true, do you see the problem?  You

12   have a third party writing checks that they want to be

13   applied to restitution, that it's not clear to me they

14   were given to Mrs. Sanborn, if what she's says is

15   correct, solely for the purposes of allowing

16   restitution, not to pay legal fees.  And you'd have to

17   get permission from those individuals, it would seem to

18   me, unless they had given actual or apparent authority

19   to Mrs. Sanborn to assign the proceeds to your firm.  So

20   I'm not requiring -- I don't believe I have jurisdiction

21   over the matter and can't require you to do anything,

22   but it seems to me at the very least the two checks that

23   were written by third parties, it's not clear to me at

24   all that your firm has any legitimate claim to that

25   money and you ought to give serious thought to refunding

41

1   that money to the individuals who produced the checks.

2           Do you have a different assessment of the

3   matter?

4           MR. BAUM:  No, not at all, your Honor.  In

5   fact, as soon as Mrs. Sanborn revoked the authorization,

6   I instructed, I e-mailed Mr. Sanborn and I said please

7   have each of these parties let me know or request a

8   refund, and I will send them their 5,000 and 10,000

9   respectively, and I haven't received anything, but we

10  have no intention of transferring that money into our

11  general account, and when I am requested or instructed

12  to refund that 20,000, that's exactly what we're going

13  to do.

14          THE COURT:  Okay.  And I think that may well

15  apply to the $5,000 that Mrs. Sanborn wrote to you.

16  It's a little less clear to me about how that money

17  should be dealt with since both Mrs. Sanborn and Mr.

18  Sanborn say that's his money that he earned, but

19  nevertheless, even if a client gives money to an

20  attorney to be used for one purpose, I think an attorney

21  has to be very careful and there are circumstances under

22  which the attorney can disregard those instructions and

23  instead apply to an outstanding fee balance presents a

24  complicated set of questions that you might be better

25  off simply avoiding by refunding that money to her.

1           I don't for a minute dispute your right to be

2    paid for your services.  Mr. Sanborn entered into a fee

3    agreement with your firm.  You're entitled to be paid.

4    And it is not in any way troubling to me that your firm

5    would demand payment and take whatever actions are

6    necessary to insure that the firm is paid consistent

7    with your ethical obligations to Mr. Sanborn.  And so

8    I'm not in any way suggesting that you shouldn't be

9    paid.  I'm simply suggesting that under the

10   circumstances under which this money found its way into

11   your trust account, and again, I'm not ordering you to

12   do this, I'm simply suggesting that this may be the more

13   prudent thing to do.  The more prudent thing to do may

14   be simply refund the entire balance while still

15   maintaining a demand that you wish to make against Mr.

16   Sanborn for any outstanding unpaid attorney's fees.

17           MR. BAUM:  I agree, your Honor, and we have

18   every intention, we will do that.  I would prefer

19   refunding the two checks from the other parties to them

20   directly.  So if Mr. Sanborn or his mother will provide

21   me with some indication that that's consistent with what

22   they want, then that's what we'll do, and we will send

23   the 5,000 back to Mrs. Sanborn.

24           THE COURT:  That, I think that would be the

25   easiest thing to do.  Mr. Sanborn, you're not asking me

1    for any particular relief at this point with respect to

2    your case or your sentence, but with respect to the

3    money, does that seem to you to be an appropriate thing

4    to do here, to simply obtain the necessary

5    authorizations from the individuals who wrote the

6    checks, allowing those monies to be refunded to those

7    individuals, and having the firm refund the $5,000 to

8    your mother?

9         MR. SANBORN:  That's absolutely fine, your

10    Honor, I just -- the money was supposed to be to help

11    start paying down what I owe, and I think that -- we

12    can't rewrite history and I still am just totally

13    confused of why a defense attorney wouldn't try to

14    portray this in the best light, and that day he allowed

15    you to continually discuss how I made no efforts when he

16    knew two minutes earlier in that hallway he had assigned

17    papers to divert money from restitution payments to his

18    personal account, and I'm just -- this whole motion

19    isn't about resentencing or any of that.  It's about we

20    can't rewrite what happened that day.

21         THE COURT:  Let me say a couple things.

22    First, I think we've agreed on the appropriate method to

23    get the money out of the trust account and back to the

24    individuals involved.

25         You say you can't rewrite history and that you

44

1   say your purpose was to get restitution to the victim.

2   If that is so, there is absolutely nothing prohibiting

3   you from simply getting appropriate checks cut to the

4   probation office for the purpose of paying this money

5   directly to the victims for restitution.  So, if you're

6   really -- if that's what your real concern is, not

7   simply trying to get a reduction in your sentence but

8   trying to get restitution and those people are willing

9   to stand by and produce that money for restitution in

10  exchange for your agreement to try to repay them at a

11  later date, then I strongly encourage you to do that.

12  It won't affect your sentence one way or another whether

13  you do it or don't do it, but if that's what you're

14  intending to do, it won't make the victim whole, but

15  something approaching 7, 8 percent of the total

16  restitution balance certainly wouldn't hurt if you

17  really do want to make amends and compensate the victim

18  for the -- in part.

19          So, if you're willing to do that, I would

20  encourage you to do it.  I'm not requiring you to do it.

21  I'm telling you that it won't affect your sentence in

22  any way.  But if that's what you really want to do, you

23  can see that that happens.

24          With respect to whether you're trying to

25  understand your lawyer's position, and I'm not

1   interested in defending your lawyer, I simply will tell

2   you that he is right about this.  If he had walked in

3   and said, judge, I've got a check for 20 grand here, 15

4   of which had been -- or from his perspective of what he

5   says is true, he didn't know this was -- any of it was

6   because of jobs you worked, simply we got the mother and

7   some friends that are willing to advance the defendant

8   some money to pay the restitution and we're agreed to

9   offer it now, I would have said, great, thank you, I

10  appreciate that, but it would not have affected my

11  sentencing judgment in any way, and I think he was

12  essentially correct about that assessment.

13          Certainly to the extent someone can make

14  restitution to a victim and the victim stands up in

15  court and says, judge, restitution has been made to me,

16  I am grateful, I am satisfied, I believe this defendant

17  has shown true remorse and has tried to make amends, if

18  a victim says that to me at a sentencing hearing, that

19  can affect my sentencing judgment.

20          If a defendant undertakes efforts to earn

21  money himself that he otherwise, I couldn't otherwise

22  compel him to earn and devotes that to restitution in

23  advance of sentencing, that could have an affect,

24  although given the amounts here, at most would have had

25  a modest affect in your sentence.  But simply coming

1    into court and saying I've got wealthy friends who can

2    pay that debt off, judge, let me go, that isn't

3    happening with me.  It doesn't cut it, it never has, it

4    never will.  And given the crime that you committed, you

5    would have been going to prison anyway.  So I don't want

6    to give you any false allusions about that.

7           So your lawyer, if under the circumstances, if

8    they are as he described them, that I get these checks,

9    little explanation, I don't hear that they're even

10   deposited until the day of the sentencing hearing, it's

11   only $20,000, I don't know anything about the defendant

12   having worked multiple jobs to try to get the proceeds,

13   his judgment about that is an entirely appropriate

14   judgment for a lawyer to make because in fact that

15   information would not have benefitted you, I'm confident

16   in saying that.

17          Now, if there -- there were certain risks

18   associated with it.  If, for example, I've got the

19   restitution but it's not -- he makes a statement like

20   that and it turns out the checks bounce, now you say he

21   knew they were deposited or they had been deposited as

22   of that day, he didn't tell me he knew they had been

23   deposited, he suggested he had some concern about

24   whether they would in fact clear.  Ordinarily when

25   people make a restitution payment in advance of

1   sentencing, they make it.  They give it to the probation

2   office in advance of sentencing.  This was done at such

3   a late date that it would have been impossible,

4   virtually impossible to do that.

5           So, you may, and you are free, I'm not in any

6   way suggesting that you should or should not, you are

7   free if you believe that your lawyer had not acted

8   consistent with his professional responsibilities to

9   pursue the matter with an appropriate professional

10  conduct committee.  You are free if you believe that you

11  have received ineffective assistance of counsel to raise

12  that issue in an appropriate motion in an appropriate

13  time.  The motion is called a Section 2255 motion.  The

14  court has forms that deal with it.  Ordinarily you have

15  to bring that claim within one year of the judgment in

16  the case or it is barred.  If you bring such a claim, I

17  will consider it, but I'm not giving you any false hope

18  about any such claim really being meritorious, but

19  you're free to do it.  So I'm not compromising you from

20  doing anything.  I just was unwilling to let this matter

21  go without further investigation having received your

22  letter.  Having received your letter and heard each

23  parties' view of it, it's not my view that I am duty

24  bound to refer this matter.  What I have heard here does

25  not suggest to me that Attorney Baum breached his

48

1    professional conduct obligations, and instead this

2    appears to be a matter that was in the nature of a

3    misunderstanding.  I'm not here to praise Attorney Baum

4    about this, that's not my job, nor is it to criticize

5    him.  My job is to figure out did he violate his

6    professional conduct obligations in such a way that

7    would require me to refer it to a professional conduct

8    organization, and while I'm not pleased with all of his

9    actions, I don't feel that he has engaged in conduct

10    that violates his professional conduct obligation, so

11    I'm not prepared to make a referral at this time.  Yes?

12            MR. SANBORN:  Your Honor, I guess, you know,

13    this whole thing has been drawn out for me and my family

14    and what we really wanted to show more than anything was

15    intent.  That I had good intentions.  I continue to have

16    good intentions.  And I hear it all the time from

17    attorneys.  My question is, where was his intent and,

18    you know --

19            THE COURT:  Well, I think he had multiple

20    intents.  His intent was to try to represent you and get

21    the lowest possible sentence for you by urging you

22    repeatedly to come up with restitution money.

23            MR. SANBORN:  And I tried.

24            THE COURT:  You delayed until the very last

25    minute providing any and then you provided a very small

1    percentage of the total result.  He made a judgment that

2    wouldn't be in your interest to raise that matter with

3    the court based on what he says he knew at the time.

4    That seems to me to be an entirely appropriate judgment.

5    He also knew that he had an outstanding fee obligation,

6    and he saw this money as available to satisfy his fee.

7    I would not have pursued the matter in the same way that

8    he did.  He, having heard the circumstances,

9    understanding the details of it now is prepared to

10   refund the money, and I'm not prepared to say that that

11   -- that his actions violate his obligations under the

12   professional conduct code, and beyond that I'm not

13   saying you should be happy or satisfied with what he did

14   in this case, I'm simply saying I'm not satisfied that I

15   have a duty to refer this for further investigation by a

16   professional conduct committee.  I would not have

17   pursued the matter in the same way that he pursued it.

18   I would have, based on what he says he knew, I would

19   have most likely made the judgment not to mention it at

20   the sentencing hearing.  If I could have gotten the

21   money in advance, far enough in advance and I was

22   satisfied that it was legitimate, from a legitimate

23   source of funds that could be applied to restitution, I

24   would direct that the restitution be paid in advance to

25   the probation office, well in advance, but he didn't get

1    it until the very end.

2         What I would not have done is I would not have

3    spoken to your mother and asked the mother to assign

4    that to the outstanding fee balance.  I simply would

5    have left the money in the account until after the

6    sentencing hearing and then explored the matter further

7    with your mother and you, making clear that we're

8    prepared to refund the money to you but not prepared to

9    abandon our demand that you pay our fee because you owe

10   him just like you owe anybody else that does things for

11   you.  You have a contractual obligation to pay him.

12   He's entitled to seek payment from you.  But under these

13   circumstances, I would not have asked the mother to

14   assign the money to the payment of the outstanding fee

15   balance.  I would have instead, especially because if

16   two of the three checks come from third party sources

17   and the third comes from your mother who is not

18   contractually obligated to pay your fee, you are, I

19   would have refunded the money and continued to make

20   demand that you make payment.  His decision to do

21   otherwise, under these circumstances it is not clear to

22   me that it is a professional conduct violation and Mr.

23   Kinsella is not arguing that it is, so I'm not prepared

24   to make a referral.  That's all I can say about that.

25         MR. SANBORN:  Thank you for the time.  I

1  appreciate it.

2            THE COURT:  All right, is there anything else

3  we need to cover today?

4            MR. KINSELLA:  No, thank you.

5            THE COURT:  All right, thank you.

6            MR. BAUM:  Your Honor?

7            THE COURT:  Yes?

8            MR. BAUM:  Your Honor, I would like the

9  exhibits, I mean they're not my exhibits, but could they

10  be made part of the record?

11            THE COURT:  Yes, the exhibits will be made

12  part of the record.

13            MR. BAUM:  Thank you, your Honor.

14            THE COURT:  Is there anything else?

15            MR. BAUM:  No, your Honor.

16            THE COURT:  All right, thank you.

17            (Adjourned at 2:35 p.m.)

18

19

20

21

22

23

24

25

52

```
 1
 2                        C E R T I F I C A T E
 3
 4            I, Sandra L. Bailey, do hereby certify that
 5       the foregoing transcript is a true and accurate
 6       transcription of the within proceedings, to the best of
 7       my knowledge, skill, ability and belief.
 8
 9
10       Submitted: 6/17/10        /s/ Sandra L. Bailey
                                   SANDRA L. BAILEY, LCR, CM, CRR
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```